JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Johnetta Scheh, Individually and as Representative of Estate of Donald Scheh, Troy Scheh

**(b)** County of Residence of First Listed Plaintiff   Austin County, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

J. martin Clauder, Law Office of J. Martin Clauder, PO Box 171, Gonzales Texas 78629. 512-348-7752

## DEFENDANTS

Monsanto Company, Bayer AG

County of Residence of First Listed Defendant   St. Louis County, Missouri
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1   U.S. Government
Plaintiff

❏ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 2   U.S. Government
Defendant

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ☒ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 835 Patent - Abbreviated | ❏ 460 Deportation |
| Student Loans | ❏ 340 Marine | Injury Product | | New Drug Application | ❏ 470 Racketeer Influenced and |
| (Excludes Veterans) | ❏ 345 Marine Product | Liability | | ❏ 840 Trademark | Corrupt Organizations |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | (15 USC 1681 or 1692) |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | Act | ❏ 862 Black Lung (923) | ❏ 485 Telephone Consumer |
| ❏ 190 Other Contract | Product Liability | ❏ 380 Other Personal | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | Protection Act |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | Relations | ❏ 864 SSID Title XVI | ❏ 490 Cable/Sat TV |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 850 Securities/Commodities/ |
| | ❏ 362 Personal Injury - | Product Liability | ❏ 751 Family and Medical | | Exchange |
| | Medical Malpractice | | Leave Act | | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | Income Security Act | or Defendant) | ❏ 895 Freedom of Information |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Act |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | Agency Decision |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | ❏ 950 Constitutionality of |
| | Other | ❏ 550 Civil Rights | Actions | | State Statutes |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

❏ 2   Removed from
State Court

❏ 3   Remanded from
Appellate Court

❏ 4   Reinstated or
Reopened

❏ 5   Transferred from
Another District
*(specify)*

❏ 6   Multidistrict
Litigation -
Transfer

❏ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332(a)(1)

Brief description of cause:
The matter in controversy exceeds $75,000 and is between citizens of different states.

## VII. REQUESTED IN COMPLAINT:

❏   CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
over $1,000,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Vince Chhabria

DOCKET NUMBER   MDL No. 2741

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| JOHNETTA SCHEH, INDIVIDUALLY | ) | Civil Case No._____ |
| AND AS REPRESENTATIVE OF | ) | |
| THE ESTATE OF | ) | |
| DONALD SCHEH, DECEASED | ) | |
| TROY SCHEH. | ) | |
| PLAINTIFFS | ) | |
| | ) | COMPLAINT |
| VS | ) | |
| | ) | |
| | ) | |
| MONSANTO COMPANY | ) | |
| AND BAYER AG | ) | |
| DEFENDANTS | ) | |

Comes Now, Plaintiff, Johnetta Scheh, Individually and as Representative
of the Estate of Donald Scheh, deceased, and Plaintiff, Troy Scheh, surviving son

of Donald Scheh, by and through their counsel, and for their cause of action against defendant Monsanto Company and Bayer AG state to the Court as follows:

## I. **INTRODUCTION**

## THE PARTIES

Plaintiffs

1.     Plaintiff, Johnetta Scheh is a citizen of the State of Texas and resides in Austin County, Texas, and brings this suit in her individual capacity and in her representative capacity of the Estate of Donald Scheh.

2.     Plaintiff, Troy Scheh is a citizen of the State of Texas and resides in Ft. Bend County, Texas.

3.     Plaintiffs are beneficiaries entitled to bring this action pursuant to Section 71.004 of the Texas Civil Practices and Remedies Code.

4.     Johnetta Scheh, Plaintiff, and duly appointed Independent Executrix of the Estate of Donald Scheh, deceased, complains of Defendant, Monsanto, and Defendant, Bayer AG, for the reasons set out more completely herein. Plaintiff, Johnetta Scheh was on January 17, 2017, issued Letters Testamentary of Donald Scheh, deceased by the County Count of Austin County, Texas. The statutory beneficiaries are entitled to bring an action on account of the wrongful death of decedent, but they have not commenced the action within three months of decedent's death and have not requested that Plaintiff not commence such action. Therefore, Plaintiff, Johnetta Scheh brings this action pursuant to Section 71.004 of the Texs Civil Practices and Remedies Code of Texas on behalf of herself and brings this suit in her representative capacity as personal representaative of the

Estate of Donald Scheh . Troy Scheh, son of the deceased, brings this suit in his individual capacity.

5.      As a proximate result of the conduct and actions of Monsanto as set forth herein, the decedent suffered years of conscious pain and suffering.

6.      In 2008, the decedent was diagnosed with non-Hodgkins lymphoma and died on March 30, 2016, from complications related to non-Hodgkins lymphoma. For the reasons stated below herein, the death of the deceased was the proximate result of the actions and conduct of Monsanto and Bayer Agq   q       ++ and Defendants are strictly liable and liable for the death of the deceased.

Defendants

7.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri. It's parent company is Bayer AG, a German corporation with its principal office in the United States located in Pennsylvania.

8.      At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

9.      In 1970, Defendant Monsanto Company, discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

10.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops, In 2010, an estimated 70% corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

11.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater areas where Roundup® is used. It has been found in food, in the urine  of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

12.     On March 20, 2015, the International Agency for Research on Cancer ("IARC") an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countris around the world, and it traces the health implications from exposure to glyphosate since 2001.

13.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

14.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working

Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic/chronic lymphocytic leukemia, B-Cell lymphoma and multiple myeloma.

15.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

16.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States Consumers, that glyphosate-based herbicides, including Roundup ®, create no unreasonable risks to human health or to the environment.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332. There is a complete diversity of citizenship between the parties because Johnetta Scheh and Troy Scheh are citizens of the State of Texas, a different state from the states in which Defendants Monsanto and Bayer claim citizenship, namely Missouri and Pennsylvania.

18.     In addition, Plaintiffs seek damages in excess of $75,000.00, exclusive of interest and costs.

19.     At all times material hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, labeling, distributing and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Texas and the County of St. Louis, Missouri.

20.     At all times relevant hereto, Monsanto was a Delaware based corporation

Page 5 of 40

with its headquarters and principal place of business in St. Louis, Missouri, and therefore is not a local Defendant for purposes of removal.

21.     This Court has personal jurisdiction over Monsanto and Bayer under C.C.P. § 410, because Monsanto and Bayer know or should have known that their Roundup® products are sold throughout the State of Texas, and more specifically, upon information and belief, caused Roundup® to be sold to Plaintiff, Johnetta Scheh's deceased husband, Donald Scheh, in the State of Texas.

22.     In addition, Monsanto and Bayer maintain sufficient contacts with the State of Texas such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

23.     Plaintiffs have timely filed this lawsuit less that two years from the time the Plaintiffs knew of the injury or reasonably knew of the injury and that it may have been wrongfully caused.

24.     Venue is proper before this court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## III.   FACTS

25.     Glyphosate is a broad-spectrum, nonselective herbicide used in a wide variety of herbicidal products around the world.

26.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce to by milling, baking, or brewing grains.

Page 6 of 40

27.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers it use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or the environment. Of course, history has shown that to not be true. According to the WHO, the main chemical ingredient of Roundup ®-glyphosate-is a probable cause of cancer. Those  most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data  and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince governmental agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup ®

28.The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

29.    The  manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 USC §136 et seq. FIFRA requires all

pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, use, except as described by the Act. 7 U.S.C.§136a(a).

30.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C.§136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

31.    The EPA registered Roundup ® for distribution, sale, and manufacture in the United States and the State of Texas.

32.    FIFRA generally requires that the registrant, Monsanto, in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

33.    Based on early studies that glyphosate could cause cancer in laboratory

animals. the EPA originally classified glyphosate as possibly carcinogenic to humans (group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made it clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that the designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

34.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

35.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup ®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

36.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to th toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for Roundup ® herbicide to be invalid. An EPA reviewer stated after, after finding "routine falsification of data" at IBT that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

37.     Three top executives of IBT were convicted of fraud in 1983.

38.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®, In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing and of pesticides and herbicides.

39.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

***The Importance of Roundup® to Monsanto's Market Dominance Plan***

40.     The success of Roundup ® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemical division's operating, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

41.     In response, Monsanto began the development of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate  share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

42.     Through a three pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto' revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®**

43.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate based herbicides, including Roundup®, were "safer than table salt" and "practically nontoxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

  a)     Remember that environmentally friendly Roundup ® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customer's driveways, sidewalks and fences...

  b)     And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup ® everywhere you've got a weed, brush, edging or trimming problem.

  c)     Roundup® biodegrades into naturally occurring elements.

  d)     Remember the versatile Roundup® herbicide stays where you

put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It...stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching, Then soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required, It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

k) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

44.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)    its glyphosate-containing pesticide products or any component

thereof are safe, non-toxic, harmless or free from risk.***

b)     its glyphosate-containing pesticide products or any component
       thereof manufactured, formulated, distributed or sold by
       Monsanto are biodegradable***

c)     its glyphosate-containing pesticide products or any component
       thereof stay where they are applied under all circumstances and
       will not move through the environment by any means***

d)     its glyphosate-containing pesticide products or any component
       thereof are "good" for the environment or are "known for their
       environmental characteristics."***

e)     glyphosate-containing pesticide products or any component
       thereof are safe or less toxic than common consumer products
       other than herbicides;

f)     its glyphosate-containing products or any component thereof
       might be classified as "practically nontoxic."

37.     Monsanto did not alter its advertising in the same manner in any state other
than New York, and on information and belief has not done so today.

38.     In 2009, France's highest court ruled that Monsanto had not told the truth
about the safety of Roundup®. The French Court affirmed an earlier judgment that
Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and
that it "left soil clean."

*Classifications and Assessments of Glyphosate*

45.     The IARC process for the classification of glyphosate followed the stringent
procedures for the evaluation of a chemical agent. Over time, the IARC
Monograph program has reviewed 980 agents. Of those reviewed, it has

determined 116 agents to be Group 1 (Known Human Carcinogens); 73 Agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcenogenic.

46.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

47.    One year before the Monograph meeting, the meeting is announced and there is a call for both data and experts. Eight months before the Monograph meeting, the working group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the meeting, the call for data is closed and the various draft sections are distributed among Working Group  for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

48.    In assessing an agent, the IARC Working Group reviews the following information:

        a)    human, experimental, and mechanistic data;

        b)    all pertinent epidemiological studies and cancer bioassays; and

        c)    representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and

reviewers cannot be associated with the underlying study.

49.   In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

50.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

51.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed control workers in the United Kingdom; and para-occupational exposure in farming families.

52.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

53.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

54.   The assessment of the IARC Working Group identified several case control

studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

55.     The IARC Working Group found an increased exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

56.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

57.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell ademnoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.     The IARC working group also noted that glyphosate has been detected in the urine of agriculture workers, indicating absorption. Soil Microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

59.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

60.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic

Page 16 of 40

disturbances, including the inhibition of protein and secondary biosynthesis and general metabolic disruption.

61.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

62.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. This fact sheet describes the release patterns for glyphosate as follows:

***Release Patterns***

63.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and clean-up, and from spills. Since glyphosate is not a listed chemical in the Toxic Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

64.    In 1995, the Northwest Coalition for alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Ban on Roundup®/Glyphosate

65.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March, 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons, In garden centers, Roundup ® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

66.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

67.    France banned the private sale of Roundup ® and glyphosate following the IARC assessment for Glyphosate.

68.    Bermuda banned both the private sale and commercial sale of glyphosates, including Roundup®. The Bermuda Government explained its ban as follows:"following a recent study carried out by a leading cancer agency. The importation of weed spray Roundup® has been suspended.

69.     In June, 2019, the Austrian Government banned the use of glyphosate.

70.     The Sri Lankan government banned the private and commercial use of glycophosates, particularly out of concern that glycophosate has been linked to fatal kidney disease in agricultural workers, but rescinded the decision out of concern for declining retail sales.

71.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of cocoa, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

72.     In November 2015, 96 prominent experts, including almost all the whole IARC team, reiterated IARC's assessment that  Roundup® is probably a human carcinogen.

73.     In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health Journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

74.     In June 2016, the European Union refused to re-register glyphosate containing herbicides due to safety concerns and will, in all likelihood begin recalling all glyphosate-containing products within the European Union. Indeed, in June 2016, the EU did not vote to extend the registration of glyphosate due to safety concerns. The fate of the product in Europe is now in question.

## DECEASED, DONALD SCHEH'S EXPOSURE TO ROUNDUP®

75.     Upon information and belief, Donald Scheh first purchased  Roundup® at a time no later than 1986. Donald Scheh frequently used  Roundup® around his property to manage weeds. Donald Scheh applied  Roundup® on his land and

Page 19 of  40

regularly used Roundup® for such purpose from 1986 to at least 2008.

76.    Upon information and belief, when Donald Scheh purchased Roundup®, he believed it was not a carcinogen, and he specifically relied on the labeling and promotion of Roundup® as being safe to humans in making his decision to purchase and use the product.

77.    In August, 2006, he was diagnosed with Diffuse Large B Cell Lymphoma with High Grade Features, and in February 2016, he underwent a biopsy and was diagnosed with Diffuse Large B Cell Lymphoma with Aggressive Features.

78.    Over the months after August 2006, Donald Scheh underwent aggressive treatment for his cancer, including multiple rounds of chemotherapy.

79.    Donald Scheh never did learn of the link between Roundup® exposure and Non-Hodgkin lymphoma and his surviving spouse, Johnetta Scheh, and surviving son, Troy Scheh did not learn of such link until 2019.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

80.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

81.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from consumers and Donald Scheh the true risk associated with Roundup® and glyphosate.

82.    At all relevant times, Defendants have maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

83.    Indeed, even as July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and *agree*

that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

84.    As a result of Defendants' actions, upon information belief, Donald Scheh was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed the deceased, Donald Scheh, to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

85.    Furthermore, Defendants are estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®. Defendants were under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup®. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

86.    Upon information and belief, Donald Scheh, had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Donald Scheh could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the know or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature,

Page 21 of 40

extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## IV. CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)
### (AGAINST MONSANTO)

87.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

88    Plaintiffs bring this strict liability claim against Monsanto and Bayer AG for defective design.

89.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, Roundup® products and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including deceased, Donald Scheh, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff's deceased husband, as described above.

90.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in

particular, the Plaintiff, Johnetta Scheh's, deceased husband.

91.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Texas and throughout the United States, including Plaintiff, Johnetta Scheh's, deceased husband, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

92.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

93.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of he manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

94.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

95.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed designed, licensed manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

> a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and consequently,

Page 23 of 40

dangerous to an extent beyond that which an ordinary consumer would contemplate.

b) When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Monsanto could have employed safer alternative designs and formulations.

96.   Plaintiff's deceased husband was exposed to Roundup® products in the

Page 24 of 40

course of his work, as described above, without knowledge of their dangerous characteristics 90. At all times relevant to this litigation, the Deceased used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

97.    The deceased could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate containing products before or at the time of exposure.

98.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

99.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

100.   Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the deceased herein.

101.   Therefore as a result of the unreasonably dangerous conditions of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

102.   The defects in  Roundup® products caused or contributed to cause the

Page 25 of 40

deceased's death, and, but for Monsanto's misconduct and omissions, deceased would not have sustained the condition causing his death.

103.   Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the deceased, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

104.   As a direct and proximate result of Monsanto placing the defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer emotional anguish, as well as economic hardship, including considerable expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages in an amount in excess of Twenty-five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COURT II
## STRICT LIABILITY (FAILURE TO WARN)
## AGAINST MONSANTO

105.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

106.   Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

107.   At all times relevant to this litigation, Monsanto engaged in the business of

testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the deceased, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

108.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the deceased, and therefore, had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

109.   At all times relevant to this litigation, Monsanto had a duty to properly, develop, test, design, manufacture inspect, package label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the deceased of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

110.   At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of an/or exposure to such products.

111.   At all times relevant to this litigation, Monsanto failed to investigate, study,

test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the deceased.

112.   Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end uses and consumers, such as the deceased.

113.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

114.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Texas and throughout the United States, including the deceased, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

115.   The deceased was exposed to Roundup® products in the course of their employment and/or personal use of Roundup®, without knowledge of its dangerous characteristics.

Page 28 of 40

116.   At all times relevant to this litigation, the deceased used and/or was exposed to the use of Roundup® products in their intended/or reasonably foreseeable manner without knowledge of their dangerous characteristics.

117.   The deceased could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of deceased's exposure. The deceased relied upon the skill, superior knowledge, and judgment of Monsanto.

118.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

119.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the deceased, to utilize the products safely and with adequate protection. Instead, Monsanto, disseminated information that was inaccurate, false, misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with the use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risk and dangers of exposure about the risks and dangers of exposure to Roundup® and glyphosate.

Page 29 of  40

120.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of deceased's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

121.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the the possession and/or control of Monsanto, were distributed, marketed and promoted by Monsanto, and used by deceased in their work and/or avocation.

122.   Monsanto is liable to Plaintiffs for the death of the deceased caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

123.   The defects in Roundup® products caused or contributed to cause Plaintiff's injuries and deceased's death, and but for this misconduct and omissions, plaintiff would not have sustained her injury.

124.   Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, the deceased could have avoided the risk of developing injuries as alleged herein.

125.   As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including financial expense for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein

incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE
## AGAINST MONSANTO

126.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

127.   Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the deceased.

128.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

129.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and in particular, its active ingredient glyphosate.

130.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

131.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in

Page 31 of 40

the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the deceased's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the deceased.

132.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

133.   As such, Monsanto breached the duty of reasonable care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

134.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

135.   Monsanto was negligent in the following respects:

   a)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup®

Page 32 of 40

products without thorough and adequate pre- and post-market testing.

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of an exposure to Roundup®;

c)   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)   Failing to provide adequate instructions, guidelines, and safety precautions to the persons who Monsanto could reasonable foresee would use and be exposed to its Roundup® products;

g)   Failing to disclose to the deceased, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses.

h)   Failing to warn the deceased, consumers, and the general public that

the product's risk of harm was unreasonable and that there were safer
and effective alternative herbicides available to the deceased and
other consumers;

i) Systematically suppressing or downplaying contrary evidence about
the risks, incidence, and prevalence of the side effects of Roundup®
and glyphosate-containing products.

j) Representing that its Roundup® products were safe for their intended
use, when, in fact, Monsanto knew or should have known that the
products were not safe for their intended purpose;

k) Declining to make or propose any changes to Roundup® products'
labeling or other promotional materials that would alert the
consumers and the general public of the risks of Roundup® and
glyphosate;

l) Advertising, marketing, and recommending the use of the Roundup®
products, while concealing and failing to disclose or warn of the
dangers known by Monsanto to be associated with or caused by the
use of or exposure to Roundup® and glyphosate;

m) Continuing to disseminate information to its consumers, which
indicate or imply that Monsanto's Roundup® products are not unsafe
for use use in the agricultural and horticultural industries; and

n) Continuing the manufacture and sale of its products with the
knowledge that the products were unreasonably safe and dangerous.

136   Monsanto knew and/or should have known that it was foreseeable that
consumers such as the deceased would suffer injuries as a result of Monsanto's
failure to exercise ordinary care in the manufacturing, promotion, labeling,

Page 34 of 40

distribution, and sale of Roundup®

137.   Upon information and belief, the deceased did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

138.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that plaintiffs suffered, as described herein.

139.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including the deceased, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to re-design, re-label, warn or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

140.   As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent emotional anguish. Plaintiff, Johnetta Scheh, has endured emotional pain and suffering and has suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiff's favor or compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV
## BREACH OF IMPLIED WARRANTY

141.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.  At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting their Roundup® products which are defective and unreasonably dangerous to consumers, including the deceased, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto and Bayer.

143.  Before the time that Donald Scheh, deceased, was exposed to the use of Roundup® products, Monsanto impliedly warranted to its consumers, including Donald Scheh, deceased, that its Roundup® were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

144.  Monsanto, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Donald Scheh, deceased's, injuries.

145.  Upon information and belief, Donald Scheh, deceased, relied upon the skill, superior knowledge and judgment of Monsanto and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended Purpose or use.

146.  Donald Scheh, deceased, is the intended third-party beneficiary of implied

Page 36 of 40

warranties made by Monsanto to the purchasers and users of its horticultural herbicides, and as such Plaintiffs are entitled to assert this claim.

147.  The Roundup® products were expected to reach and did in fact reach consumers and users, including, Donald Scheh, deceased, without substantial change in the condition in which they were manufactured and sold by Defendant.

148.  At all times relevant to this litigation. Monsanto was aware that consumers and users of its products, including, Donald Scheh, deceased, would use Roundup® products as marketed by Monsanto, which is to say that Donald Scheh, deceased, was a foreseeable user of Roundup®.

149.  Monsanto intended that its Roundup® products be used in the manner in which Donald Scheh, deceased, used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

150.  In reliance upon Monsanto's implied warranty, upon information and belief, Donald Scheh, deceased, used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Monsanto.

151.  Upon information and belief, Donald Scheh, deceased, could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

152.  Monsanto breached its implied warranty to consumers including Donald Scheh, deceased, in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

Page 37 of 40

153.   The harm caused by Monsanto's Roundup® products far outweighed their benefits, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous that alternative products.

154.   As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiffs have suffered severe and permanent emotional injuries and Donald Scheh, deceased,  suffered severe physical and emotional injuries, before death. Plaintiffs Johnetta Scheh and Troy Scheh have suffered pain and suffering, and Johnetta Scheh has suffered economic loss and will continue to incur these expenses in the future.

155.   WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V
## WRONGFUL DEATH ACTION

156.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

157.   The claims and causes of action for the wrongful death of Donald Scheh are brought by his wife, Johnetta Scheh, on behalf of herself and by son, Troy Scheh, pursuant to Texas Practices and Remedy Code §71.002-004.

## COUNT VI
## SURVIVAL ACTION

158.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

159.  The claims and causes of action for injuries sustained by Donald Scheh are brought in this action pursuit to the Survival Act, Texas Civil Practices and Remedies code, §71.021

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants for compensatory damages as set forth above and for exemplary damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to punish the Defendants, and to deter defendants and other businesses from like conduct, and for such other and further relief as this Court deems just, equitable, and proper.

**JURY DEMAND**

160.  Plaintiffs demand a trial by jury on all counts.

Respectfully submitted,

LAW OFFICES OF J. MARTIN CLAUDER

BY:

J. MARTIN CLAUDER
State Bar No. 04325800
P.O. Box 171
Gonzales, Texas 78629
Phone: (512) 348-7752
Fax : (512) 729-0228
Email: clauderattorney@gmail.com
ATTORNEY FOR PLAINTIFFS